UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT DAVIS,

      Plaintiff,                         Case No. 14-cv-11818
                                           Hon. Matthew F. Leitman

v.

RUTH JOHNSON, et al.,

      Defendants.
_____/

## OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER (ECF #5) AND DENYING INJUNCTIVE RELIEF

Plaintiff Robert Davis ("Davis") is a member of the Board of Education in Highland Park, Michigan (the "Board"). His term ends this year, and he desires to seek re-election. Under Michigan law, Davis may secure a spot on the general election ballot by paying a modest $100 filing fee. *See* MCL § 168.303 (the "Ballot Access Statute"). Davis concedes that the filing fee, which he can afford, is constitutional. Moreover, Davis acknowledges that the State has no obligation to provide non-indigent candidates with any additional ways to secure a place on the ballot.

But the State does provide Board candidates a second option for getting on the ballot: they may gather petition signatures from 40 registered voters in their

1

school district.  *See* MCL § 168.303(1)(b).  Davis would prefer to use the petition signature option because, he says, it will best allow him to "gauge" the extent of his "support" among the electorate.

Davis' signature gathering plans have hit a snag.  He would like to have certain individuals who are not registered to vote in Michigan (hereinafter, "non-registered persons") circulate his petitions, but a Michigan statute provides that petition signatures are valid only if, among other things, the individual circulating the petition is, himself, a registered voter in the State of Michigan.  *See* MCL §168.544c(3) (the "Registration Statute").

In *Nader v. Blackwell*, 545 F.3d 459 (6th Cir. 2008), the United States Court of Appeals for the Sixth Circuit held that a similar Ohio petition-circulator-registration statute severely burdened a candidate's speech and associational rights; was therefore subject to strict scrutiny; and could not survive such scrutiny. Invoking *Nader*, Davis argues that the Registration Statute severely burdens his First Amendment rights and that the statute cannot survive the required strict scrutiny.  He seeks a temporary restraining order requiring Highland Park City Clerk Brenda Green ("Clerk Green") to accept petition signatures gathered by non-registered persons.  The Court does not believe that Davis is likely to prevail on his First Amendment claim and declines to grant a temporary restraining order or a preliminary injunction.

The Ballot Access Statute and the Registration Statute operate in tandem and, together, they do not impose any meaningful burden on Davis' ballot-access or free-speech rights. The Ballot Access Statute provides Davis with easy access to the ballot: he need only pay the modest – and concededly constitutional – filing fee. And the Registration Statute does not prevent Davis from using non-registered persons to spread his message, to campaign on his behalf, or to gauge his support among voters. The Registration Statute prevents Davis from doing only one thing: using signatures gathered by non-registered persons to secure a place on the ballot. But he has no need to do that because the Ballot Access Statute gives him quick and simple access to the ballot. Davis has failed to show how his free-speech or ballot-access rights are seriously burdened.

This case is easily distinguishable from *Nader* because it appears that the candidate in *Nader had* to submit a minimum number of signatures to secure a spot on the ballot; there was no indication that the State of Ohio offered any other ballot-access options. Thus, the registration requirement in *Nader* – which limited the pool of circulators needed to gather the required signatures –  meaningfully impeded the candidate's effort to obtain a place on the ballot and to participate fully in the electoral process. The Ballot Access and Registration Statutes impose no such burden on Davis, and thus the application of those statutes to Davis is

likely reviewed under a relaxed level of scrutiny – a level of scrutiny the statutes can withstand.

Finally, apart from the merits, Davis does not present a strong claim for the extraordinary remedy he seeks. Davis acknowledged at a hearing before this Court that a primary "goal of this lawsuit is ultimately for [him] to get [himself] on the ballot," yet he has intentionally chosen *not* to pursue several available options for doing just that. He has not attempted to gather petition signatures himself; he has not asked a number of eligible circulators with whom he would admittedly be "comfortable" to circulate his petitions; and he has declined to pay the small filing fee to secure ballot access while his legal challenge progresses. It appears that Davis' claimed urgent need for relief is largely an emergency of his own making.

## BACKGROUND AND PROCEDURAL HISTORY

Davis is an incumbent member of the Board. (*See* Pla.'s Aff., ECF #1-1 at ¶3.) Davis initially won election to the Board in 2002, and he retained his seat in 2006 and 2010. (*Id. See also* TR, ECF #37 at 34-35, 39.) He is now seeking a fourth term in office. (*See* Pla.'s Aff. at ¶3.)

In order to secure a spot on the general-election ballot, Davis must satisfy the requirements of the Ballot Access Statute. He may do so in one of two ways. He may "file a nominating petition … with the school district filing official not later than 4 p.m. on the fifteenth Tuesday before the election date,"  MCL §

168.303(1), or, he "may pay a nonrefundable filing fee of $100.00 to the school district filing official."  MCL § 168.303(4).  Under this statute, paying the "fee has the same effect … as the filing of a nominating petition."  *Id.*

If Davis chooses the petition option, by not later than July 22, 2014, he must submit to Clerk Green –  the "school district filing official" with whom candidates for the Board must file their nominating petitions, MCL §§ 380.6, 168.4(e) – nominating petitions signed by "a minimum of 40 and a maximum of 100" electors.  MCL § 168.303(1)(b).  (*See also* Aff. of Christopher Thomas, ECF #22-2 at ¶¶5-7.)  The Registration Statute establishes certain restrictions on who may circulate, and who may execute the required circulator certification on, such petitions.  It provides that (1) "[a]t the time of circulation," a person circulating a petition to place a candidate on the ballot for the Board (and certain other offices), "shall be a registered elector of this state" and (2) "[a]t the time of executing the certificate of circulator, the circulator shall be registered [to vote] in the city or township indicated in the certificate of circulator on the petition."[1]   MCL §

---

[1] The term "Registration Statute" used herein refers to the following language from MCL § 168.544c(3):  "At the time of circulation, the circulator of a petition shall be a registered elector of this state.  At the time of executing the certificate of circulator, the circulator shall be registered in the city or township indicated in the certificate of circulator on the petition."  The final sentence of MCL § 168.544c(3), not reprinted here, is not at issue in this case and is not included in the definition of "Registration Statute" as used in this Opinion and Order.

168.544c(3).  In the required "certificate of circulator," the circulator "asserts that he or she is qualified to circulate the petition."  MCL § 168.544c(1).

Davis prefers the petition option over the filing fee option.  (Pla.'s Aff. at ¶4.)  But he does not want to comply with the Registration Statute's requirement that he use only registered Michigan voters to circulate his petitions.  Instead, Davis "desire[s] and intend[s] to use citizens that are non-registered electors" as circulators of his nominating petitions.[2]  (*Id.* at ¶5.)

Davis has spoken with Clerk Green and representatives of both Wayne County Clerk Cathy Garrett ("Clerk Garrett") and Michigan Secretary of State Ruth Johnson ("Secretary Johnson") about his choice of circulators.  (*Id.* at ¶¶6-14.)  On May 5, 2014, Davis telephoned Clerk Green, "informed [her] of [his] intentions to pick up nominating petitions for the upcoming school board election," and told her of his "intention … to utilize citizens that are not registered voters to circulate [his] nominating petitions."  (*Id.* at ¶6.)  Clerk Green informed Davis that he "could not use citizens that were not registered electors" to circulate his petitions because the Registration Statute "only permits … registered voters the right to circulate nominating petitions."  (*Id.* at ¶7.)  Clerk Green also told Davis that "if [he] were to use non-registered electors to circulate [his] nominating

---

[2]  Throughout his affidavit and Complaint, Davis uses bold or italicized text for emphasis.  For the purposes of this Opinion and Order, the Court has removed all such emphasis when quoting from Davis' filings.

petitions, none of the signatures contained on said petitions would be considered valid." (*Id.* at ¶8.)   Finally, Clerk Green said that "she would check with [Secretary Johnson's office] and/or [Clerk Garrett's office] to verify whether her stated interpretation and application of Michigan Election Law was correct." (*Id.* at ¶9.)

Davis did not wait to hear back from Clerk Green.  Instead, approximately 90 minutes after their conversation, Davis telephoned Delphine Oden ("Oden"), the Director of Elections for the Wayne County Clerk, "to verify whether [Clerk Green] "had called her to get advice and direction on [his] question…." (*Id.* at ¶11.)   Oden said "that [Clerk Green] had called her seeking advice" and "that [Oden] had advised [Clerk Green] that she correctly informed [Davis] that [he] could not use non-registered electors to circulate [his] nominating petitions." (*Id.* at ¶¶11-12.)   Later that afternoon, Davis went to Clerk Green's office to pick up the petitions, and Clerk Green confirmed that "she was advised by [Clerk Garrett's] office that [he] could not use non-registered electors to circulate [his] nominating petitions." [3]   (*Id.* at ¶13.)

---

[3]  Davis claims that he intended to have "non-registered electors" begin circulating his nominating petitions on May 5, 2014, the same day he picked up his petitions. (*Id.* at ¶16.)   According to Davis, he had "enlisted the help … of a non-registered elector who was ready and willing to volunteer immediately" to circulate his petitions on that date. (*Id.* at ¶17.)   In his affidavit, Davis asserted that he intended to submit completed petitions "on or before May 19, 2014." (Pla.'s Aff.  at ¶6.)   According to Davis, he wanted to submit his nominating petitions by that date

Davis then called "an elections specialist" in Secretary Johnson's office.  (*Id.* at 14.)   The specialist informed Davis that he "could not use non-registered electors to circulate [his] nominating petitions" and that if he did use non-registered electors, "none of the signatures … would be valid."  (*Id.*)

On May 6, 2014, the day after Davis picked up the nominating petitions and spoke with local and state election officials, he filed his Complaint in this Court seeking a declaratory judgment and injunctive relief against Secretary Johnson, Clerk Garrett, and Clerk Green (collectively, the "Defendants").[4]  (*See* Compl., ECF #1.)   The Complaint contains a single count under 42 U.S.C. § 1983 alleging that Defendants' actions infringed Davis' rights under the First Amendment.  (*See id.* at ¶¶37-50.)   Specifically, Davis alleges that due to Defendants' "enforce[ment] and implement[ation] of the circulator restrictions in [the Registration Statute], [he] is being denied the use of circulators of his choice … and [his] potential audience and the amount of speech about his views that he could generate by using non-registered electors as circulators has been 'severely' limited."  (*Id.* at ¶48.)

---

"because [he had] other personal obligations thereafter that [would] prevent [him] from seeking signatures after said date."  (*Id.* at ¶19.)  At a subsequent evidentiary hearing in this action, Davis specified that the personal obligation to which he referred in his affidavit was a criminal trial, originally scheduled for June 9, 2014, in which he was the defendant.  (TR at 33.)  Davis testified that on June 2, 2014, the judge in his criminal trial "adjourned [the] trial to September."  (*Id.* at 11.)

[4]   On May 16, 2014, the Wayne County Election Commission ("Election Commission") moved to intervene in this action.  (ECF #25.)  The Court granted the Election Commission's motion on May 22, 2014.  (*See* Dkt.)

Therefore, according to Davis, the Registration Statute "on its face, and as applied to [him], violates [] [his] First Amendment Rights [sic] to political speech." (*Id.* at ¶49.)

On May 7, 2014, Davis filed a Motion for Temporary Restraining Order. (*See* ECF #5.) Davis alleges that he is suffering "irreparable harm as a result of his loss of First Amendment freedoms and rights as a result of the Defendants enforcing" the Registration Statute. (*Id.* at ¶6.) Davis further claims in his motion that "each day that [he] is not permitted to use persons who are not registered to vote to circulate his nominating petitions, [his] First Amendment rights of political speech are further eroded…" (*Id.* at ¶5.) Davis has requested that the Court enter an order "restraining and enjoining Defendants … from enforcing and implementing any and all provisions of [the Registration Statute] so requiring circulators of nominating petitions be registered voters…" (*Id.* at ¶22.)

In response to Davis' motion, Secretary Johnson submitted, among other things, the affidavit of Christopher Thomas, the Director of Elections for the State of Michigan, and data concerning voter registration figures from the statewide Qualified Voter File. (*See* Aff. of Christopher Thomas at ¶¶13-16.) The affidavit and supporting data indicate that there are more than 7.4 million registered voters in the State of Michigan and 11,769 registered voters in the City of Highland Park. (*Id.* at ¶13, 15.) Davis has not offered any evidence to contradict these figures.

The Court held a hearing on Davis' motion on May 21, 2014. Prior to the hearing, the Court offered the parties an opportunity to present witness testimony and otherwise supplement the record; they declined. Therefore, the hearing consisted entirely of legal arguments. The Court indicated at the hearing that it would treat Davis' motion as a motion for a preliminary injunction because all adverse parties received notice and had an opportunity to be heard.

At the May 21st hearing, counsel for Davis suggested that, if given the opportunity, Davis would be able to present additional evidence regarding the burden that the Registration Statute allegedly imposes on his First Amendment Rights. To allow Davis to further develop the record, the Court held an evidentiary hearing on June 3, 2014.

Davis was the only witness to testify at the June 3rd hearing. His testimony focused on two primary issues: (1) why he wants to use the petition option for getting on the ballot rather than pay the $100 filing fee, and (2) why he wants to use non-registered persons to circulate his petitions. Davis said that the petition option allows him to "gauge whether or not" he has "support for [his] reelection." (TR at 47.) He believes it is a "huge commitment" for voters to put "their name on a dotted line saying I support you," and he thus believes that his ability to gather up to 100 signatures "is a good indication that [he has] a good broad base of support." (*Id.* at 57.) He explained that in 2010 he paid the $100 filing fee in lieu of

10

gathering petition signatures to qualify for the ballot, and that "was a big mistake." (*Id.* at 9-10.)  Because he paid the $100 filing fee, he "didn't have the opportunity to gauge the electorate and whether or not they supported [his] candidacy."  (*Id.* at 10.)  He lost the 2010 election and only reclaimed his seat on the Board through post-election litigation.  (*Id.*; *see also* Aff. of Christopher Thomas at ¶8 (citing *Davis v. Chairman*, 292 Mich. App. 603 (2011)).)   Based upon his 2010 experience, Davis concluded that "using the … filing fee mechanism does not work because you take away the opportunity to gauge whether or not your candidacy is supported by the electorate."  (TR at 10.)

Davis also contends that in light of his personal circumstances, he has a special need to use non-registered persons to circulate his nominating petitions. Specifically, Davis says that he is a "very controversial figure," and he believes that there are "a number of different issues" that may "come up" with voters when they are asked to sign his petitions.  (*Id.* at 7, 11.)  Accordingly, he has identified four specific people whom he believes are best suited to deliver his message to voters and answer "questions [regarding] the cloud that his currently over [him]" due to his pending federal criminal case.  (*Id.* at 6.)  Each of Davis' preferred circulators is not registered to vote in Michigan.  (*Id.* at 8-9.)

The four non-registered persons Davis wishes to use to circulate his petitions are Ina Watkins, Carlos Raymore, Sherry McKenzie, and Willie McKenzie. (*Id.* at

8-9, 16, 23, 42.)  Ms. Watkins is a former Michigan resident who now lives in Baltimore, Maryland.  (*Id.* at 8.)  Before leaving Michigan, she served as Davis' lawyer in "a couple of cases … dealing with the politics in Highland Park." (*Id.* at 19).   As a result of that litigation, she and Davis developed a "very close" relationship, and Davis believes that she developed a good understanding of the Highland Park community. (*Id.* at 8.)  Davis likewise enjoys a close relationship with Raymore.  Davis served as a basketball coach and mentor to Raymore for several years.  (*Id.* at 9, 13.)  The McKenzies, both of whom live in Georgia, are Davis' aunt and cousin, respectively.  (*Id.* at 16, 23, 42.)

Davis acknowledges that there are other individuals in the State of Michigan with whom he would feel "comfortable" carrying his message to voters, but he has not attempted to enlist these supporters because he feels most comfortable with the four individuals identified above. (*Id.* at 45-46; *see also id.* at 17-18.)[5]  Moreover, while Davis is a registered voter and would thus be eligible to circulate petitions on his own behalf, Davis says that he has not attempted to gather signatures himself because he believes "the electorate may get a better comfort" having a third party "give personal testimony" in support of his candidacy.  (*Id.* at 53.)

---

[5]  Davis asked one Michigan resident, John Mattox, to circulate his petitions, but Mr. Mattox declined.  (*Id.* at 18.)

Finally, during the hearing on June 3rd, Davis and his attorney made a number of concessions that are relevant to the legal issues before the Court, including the following:

- Davis acknowledged that he has sufficient financial resources to pay the $100 filing fee to secure a spot on the ballot. (*Id.* at 47.);

- Counsel for Davis agreed that the State of Michigan is under no obligation to give candidates the option of securing a spot on the ballot by collecting signatures. (*Id.* at 63.) Counsel admitted that the State could do away with the petition option altogether and simply set a reasonable filing fee (to be paid by all non-indigent candidates) as the sole option for securing a spot on the ballot. (*Id.* at 71-72.);

- Counsel for Davis conceded that the Registration Statute does not prevent Davis from "gauging support" for his candidacy in "exactly [the] way" Davis wishes to do so – by having non-registered persons ask the potential voters to sign a petition for Davis. (*Id.* at 65.) Counsel agreed that the Registration Statute only prohibits a non-registered circulator from turning in signed petitions to the election authorities, and that the Registration Statute does not prevent a non-registered circulator from gathering signatures (that will not be turned in) in order to gauge support. (*Id.*);

- Davis admitted that the non-registered persons whom he desires to circulate his petitions would be able to "accompany" an eligible petition circulator, "stand next to [the circulator], and talk to registered voters, … and deliver [Davis'] message" in an effort to obtain a valid signature. (*Id.* at 41.); and

- Davis acknowledged that he has not even considered trying to gauge support for his candidacy in some way other than circulating petitions. (*Id.* at 56.)

## ANALYSIS

I.  **Davis' First Amendment Claim is Ripe, and He Has Standing to Assert the Claim Against Clerk Green but Not Against Clerk Garrett and Secretary Johnson**

Before turning to Davis' request for relief, the Court must first address (1) the argument all Defendants have made that Davis' First Amendment claim is not ripe, and (2) Clerk Garrett's and Secretary Johnson's argument that Davis lacks standing to assert his claim against them. These arguments implicate the Court's subject-matter jurisdiction.

### A.  Davis' Claim is Ripe for Judicial Review

The Defendants argue that Davis' claim is not ripe for adjudication because "until he [actually] begins to circulate petitions, his claim that he will be harmed by the Registration Statute is premature." (*See*, *e.g.*, ECF #22 at 5.) The Court disagrees.

"[R]ipeness is peculiarly a question of timing." *Blanchette v. Connecticut General Ins. Corporations,* 419 U.S. 102, 140 (1974). "[I]ts basic rationale is to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements." *Abbott Laboratories v. Gardner,* 387 U.S. 136 (1967). A court's inquiry into the ripeness of a claim is guided by three factors: "(1) the likelihood that the harm alleged by the plaintiff[] will ever come to pass; (2) whether the factual record is sufficiently developed to produce a fair adjudication

14

of the merits of the parties' respective claims; and (3) the hardship to the parties if judicial relief is denied at this stage in the proceedings." *Berry v. Schmitt*, 688 F.3d 290, 298 (6th Cir. 2012) (quoting *Grace Community Church v. Lenox Twp.*, 544 F.3d 609, 615 (6th Cir. 2008)).  It is well settled that a plaintiff's claim is ripe when he has "alleged an intention to engage in a course of conduct arguably affected by a constitutional interest, but proscribed by a statute" and the state makes a "credible threat" to enforce the statute. *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 299 (1979).[6]

The disagreement between Davis and Clerk Green is no mere abstraction, and the harm he alleges – being denied the opportunity to use petition circulators of his choice to collect valid signatures – has already come to pass.  Davis has begun taking (at least some) steps to campaign for the Board.  He has contacted several non-registered persons to serve as his petition circulators, and he has attempted to arrange for them to circulate his petitions.  Davis has "alleged an intention" to use non-registered persons as petition circulators, and Clerk Green has made a "credible threat" to enforce the Registration Statute – she has definitively told him that she will not accept as valid any of the signatures gathered

---

[6]  Although this principle is most frequently applied where a plaintiff faces a threat of criminal prosecution, it also applies where a plaintiff faces a threat that a civil statute will be enforced against him. *See, e.g., Vermont Right to Life Committee, Inc. v. Sorrell*, 221 F.3d 376, 382 (2d Cir. 2000); *see also MedImmune, Inc. v. Genetech, Inc.*, 549 U.S. 118, 128-29 (2007).

by Davis' non-registered circulators. *See Babbitt*, 442 U.S. at 299.  In sum, there is a sufficiently concrete, real, and imminent dispute between the parties such that Davis' claim is ripe.

A Virginia district court and the United States Court of Appeals for the Fourth Circuit both reached precisely that conclusion in the closely-related case of *Perry v. Judd*, 840 F.Supp.2d 945 (E.D. Va. 20120), aff'd 471 Fed. App'x. 219 (4th Cir. 2012).  In *Perry*, Texas Governor Rick Perry, who was then running for President of the United States, challenged the constitutionality of a Virginia statute that prohibited him from using non-residents to circulate his nominating petitions. He waited to file his suit until the deadline for submitting signatutres had passed. The defendants invoked the equitable defense of laches, and the district court and Fourth Circuit both agreed that laches barred Perry's claim.   In reaching that conclusion, both courts concluded that Perry's claim became ripe for adjudication when he declared his candidacy. *Perry*, 840 F.Supp.2d at 954; 471 Fed. App'x. at 224.  The Fourth Circuit explained that Perry's "cognizable injury occurred no later than … the day on which he declared his candidacy…. At that point, the [state's] residency requirement prevented him from using non-[resident] petition circulators.  *As a matter of law*, that requirement was ripe for First Amendment challenge." *Perry*, 471 Fed. App'x. at 224 (emphasis added).

Under the *Perry* standard, Davis's claim is clearly ripe.[7]  Indeed, Davis has done more than merely declare his candidacy: he has recruited non-registered persons to circulate his petitions and Clerk Green has specifically informed him that signatures gathered by those circulators will not be counted.  Further, the parties have had the opportunity to develop the factual record through both written submissions and oral testimony, and the Court has before it "a concrete set of facts."  *Norton v. Ashcroft*, 298 F.3d 547, 544 (6th Cir. 2002).  Moreover, the upcoming filing deadline for Board candidates weighs in favor of the Court deciding the action on its merits.  Under these circumstances, Davis' claim is ripe for review.

### B.    Davis Does Not Have Standing to Bring His Claim Against Clerk Garrett or Secretary Johnson

Clerk Garrett and Secretary Johnson further contend that Davis does not have standing to bring this action against them.  They argue that Davis has not suffered an injury that is fairly traceable to them because neither of them is "involved in the handling of nominating petitions for the [Board]."  (ECF #22 at 2; *see also* ECF #20 at 3-4.)  They assert that Clerk Green is the sole election official in charge of certifying candidates for the Board and therefore Davis "cannot

---

[7]  Defendants are familiar with *Perry*.  Indeed, in a companion case to this action, *Moore v. Johnson*, 14-cv-11903, one Defendant cited *Perry* for the proposition that a candidate's injury from a petition-circulation restriction arises on the day he declares his candidacy.  *See id.*, ECF #37 at 86.

establish a connection between his alleged injury and any conduct" by them. (ECF #22 at 2.) This Court agrees.

> In order to have standing, a plaintiff must demonstrate

> (1) an allegation of an "injury in fact," which is a concrete harm suffered by the plaintiff that is actual or imminent, rather than conjectural or hypothetical; (2) a demonstration of "causation," which is a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant; and (3) a demonstration of "redressability," which is a likelihood that the requested relief will address the alleged injury.

*Friends of Tims Ford v. Tennessee Valley Authority*, 585 F.3d 955, 966 (6th Cir. 2009) (quoting *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 102-04 (1998)).

In this case, Davis has not suffered an injury in fact attributable to Clerk Garrett because Clerk Garrett plays no role whatsoever in enforcing the Registration Statute as to candidates for the Board. Indeed, the Michigan Election Law clearly establishes that it is Clerk Green – and not Clerk Garrett – who has exclusive authority to (1) receive nominating petitions filed by Board candidates, (2) review the sufficiency of the signatures on such petitions, and (3) certify candidates for inclusion on the general election ballot. *See* MCL §§ 168.301(2)(a), (c); 168.4(e); 168.552(7). While Davis alleges that Clerk Garrett "advised" Clerk Green concerning application of the Registration Statute to Davis (*see* ECF #29 at 3; *see also* Pla.'s Aff. at ¶¶11-13), that advice did not injure Davis. Clerk Garrett

gave the advice after Clerk Green had already stated that she would not accept signatures gathered by non-registered persons, and, moreover, Clerk Garrett's advice was not binding on Clerk Green.  Accordingly, Davis' alleged injury due to the operation of the Registration Statute is not fairly traceable to Clerk Garrett.

Davis also has failed to demonstrate that he suffered an injury in fact attributable to Secretary Johnson.  Davis offers two rationales for why he has standing as to Secretary Johnson.  First, Davis claims that Secretary Johnson "directed and advised" Clerk Green to enforce the Registration Statute against him (*see* ECF #29 at 3).  However, there is no evidence in the record to that effect. Davis' affidavit is the only evidence concerning statements by Secretary Johnson, and his affidavit says nothing about Secretary Johnson (or anyone in her office) actually directing Clerk Green to enforce the Registration Statute against Davis. (*See* Pla.'s Aff., generally.)  And in any event, all of the alleged communications from Secretary Johnson came *after* Clerk Green had already clearly indicated to Davis that she would not accept signatures from non-registered persons, and thus the alleged communication from Secretary Johnson did not injure Davis.  (*See* Pla.'s Aff. at ¶¶7-8.)  Second, Davis claims that he has standing as to Secretary Johnson because her office "directly … informed him" that he could not use non-registered persons to circulate his nominating petitions.  (ECF #29 at 3.)  However, Davis' informational phone call to the elections specialist in Secretary Johnson's

19

office does not confer standing because, as discussed above, Clerk Green – not Secretary Johnson – was the election official who made the determination that the Registration Statute would apply to Davis' petitions.[8]

Therefore, while Davis has standing to bring his claim against Clerk Green, he does not have standing to bring his claim against Clerk Garrett or Secretary Johnson.[9]

## III.   Davis Has Not Satisfied the Four-Part Test for Injunctive Relief

When a court considers a motion for a preliminary injunction, it must weigh four factors:

> (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction.

---

[8]   Although Secretary Johnson would resolve a challenge to Clerk Green's determination of the sufficiency of a Board candidate's nominating petitions, *see* MCL § 168.552, there has been no such challenge to date – because Davis never submitted petitions, Clerk Green never rejected any of his petitions, and thus there was nothing to challenge with Secretary Johnson. Davis does not have standing to sue Secretary Johnson on the ground that she may rule against him in some yet-to-be-filed, hypothetical appeal. *See Steel Co.*, 523 U.S. at 103 (plaintiff does not have standing as to a defendant when a harm is "conjectural or hypothetical").

[9]   Clerk Garrett and Secretary Johnson cast their arguments in terms of Davis' lack of standing. The arguments could also have been presented under Rule 12(b)(6) of the Federal Rules of Civil Procedure in terms of Davis' failure to state a claim against them. Because Davis does not sufficiently allege that Clerk Garrett and/or Secretary Johnson have done anything that infringes his First Amendment rights, Davis likely has failed to state a claim against them under 42 U.S.C. § 1983.

*Certified Restoration v. Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007).  Courts are generally required to balance these four factors, and none of the factors, standing alone, is a prerequisite to relief.  *Golden v. Kelsey-Hayes, Co.*, 73 F.3d 648, 653 (6th Cir. 1996).  However, when "a party seeks a preliminary injunction on the potential violation of the First Amendment, the likelihood of success on the merits often will be the determinative factor." *Libertarian Party of Ohio v. Husted*, – F.3d –, 2014 WL 1703856 at *8 (6th Cir. May 1, 2014) (quoting *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998)).  A preliminary injunction "is an extraordinary remedy" that should be granted only when the circumstances "clearly demand it."  *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000).

### A.    Davis Has Not Shown a Likelihood of Success on the Merits

Davis inists that under *Nader* and other related decisions, he has a clear First Amendment right to have non-registered persons circulate his petitions; the Defendants counter that the Registration Statute and Ballot Access Statute are precisely the type of "reasonable regulations" of the electoral process that states "must" enact. *See Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997).  This is thus a case in which "the boundaries of First Amendment rights push up against a State's authority to regulate elections…." *Citizens for Tax Reform v. Deters*, 518 F.3d 375, 380 (6th Cir. 2008).  "In *Timmons*, the Supreme

Court set forth the [proper] framework for resolving these types of competing interests." *Deters*, 518 F.3d at 380.  There, the Supreme Court explained:

> When deciding whether a state election law violates First and Fourteenth Amendment associational rights, we weigh the character and magnitude of the burden the State's rule imposes on those rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary.  Regulations imposing severe burdens on plaintiff's rights must be narrowly tailored and advance a compelling state interest.  Lesser burdens, however, trigger less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, non-discriminatory restrictions.  No bright line separates permissible election-related regulation from unconstitutional infringements on First Amendment freedoms.

*Timmons*, 520 U.S. at 358-59 (citations and internal quotation marks omitted).

Two years after *Timmons*, the Supreme Court again emphasized that "'no litmus paper test' will separate valid ballot-access provisions from invalid speech restrictions; we have come upon 'no substitute for the hard judgments that must be made.'" *Buckley v. American Constitutional Law Found.*, 525 U.S. 182, 192 (1999), (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)).  In making the "hard judgment" as to whether a petition circulation regulation imposes an impermissible burden on First Amendment rights, a court does *not* review the statute "in isolation, but [instead does so] within the context of the state's overall scheme of election regulations." *Lerman v. Board of Elections in the City of New York,* 232 F.3d 135, 145 (2d Cir. 2000) (emphasis added) (citing *Prestia v. O'Connor*, 178 F.3d 86, 88 (2d Cir. 1999)).

**1. Davis Has Failed to Show a Likelihood that the Ballot Access Statute and Registration Statute Severely Burden His First Amendment Rights and are thus Subject to Strict Scrutiny as Applied to Him**

The Ballot Access Statute and the Registration Statute operate in tandem and, together, they impose a *de minimi*s burden on Davis' First Amendment and ballot-access rights. The Ballot Access Statute offers Davis two options for getting on the ballot: he may pay the $100 filing fee or gather 40 signatures from registered voters. Davis has conceded that the filing fee requirement is constitutional as applied to him – and properly so because at least two federal courts of appeals have upheld similar filing fees. *See Biener v. Calio*, 361 F.3d 206 (3d Cir. 2004); *Adams v. Askew*, 511 F.2d 700 (5th Cir. 1975). Likewise, Davis has conceded that the State had no obligation to create an additional way – i.e., other than paying the filing fee – for non-indigent candidates to secure a spot on the ballot. And this concession, too, is proper because "candidates who [are] able, but simply unwilling, to pay a filing fee are not entitled to another route to the ballot." *Biener*, 361 F.3d at 215. Thus, the Ballot Access Statute provides Davis with at least one minimally-burdensome and undisputedly-constitutional option for gaining access to the ballot.

Davis contends that even if the filing fee is permissible, the Registration Statute nonetheless severely burdens his First Amendment rights. Davis' argues that the Registration Statute has "severely limited" his "potential audience and the

amount of speech about his views that he could generate." (Compl. at ¶48.)  As an initial matter, Davis' argument is flawed because it focuses myopically on the Registration Statute and does not address the Ballot Access Statute – specifically, the provision of that statute allowing Davis to dispense with petitions altogether. Thus, Davis' argument violates the fundamental principle that a court does not review the burden imposed by a statute regulating petition circulation "in isolation, but [instead does so] within the context of the state's overall scheme of election regulations." *Lerman,* 232 F.3d at 145.

More importantly, the Registration Statute does *not* prevent Davis from using non-registered persons to spread his message or to campaign on his behalf. Indeed, it does not prevent anyone from saying anything on his behalf, and, in that respect, cannot be regarded as a severe burden on free speech. *See Citizens for John W. Moore Party v. Board of Election Commr's of the City of Chicago*, 794 F.2d 1254, 1260 (7th Cir. 1986) (statute barring persons from circulating petitions for candidates from more than one party not severely burdensome because, among other things, "[t]he statute does not affect the ability of 'used' circulators to speak. They may campaign for anyone to their hearts' content; [the candidate's] friends could have done everything for him … except collect signatures.").  Moreover, as Davis himself acknowledges, the non-registered persons whom Davis wants to speak on his behalf could accompany a qualified petition circulator while that

person collects signatures in order to "deliver [Davis'] message" to the electorate. (*See* TR at 41.)  Thus, the Registration Statute does not prevent Davis' preferred spokespersons from delivering his message to the people and in the exact forum in which he desires.

The Registration Statute prevents Davis from doing only one thing: using non-registered persons to gather valid signatures that he could use to secure a place on the ballot.  While some courts, including the Sixth Circuit in *Nader*, have recognized that a limitation like this may severely burden a candidate's First Amendment rights, they have only done so where a candidate's *sole* option for securing a spot on the ballot is to submit a minimum number of signatures.  *See, e.g.*, *Nader*, 545 F.3d at 476; *Nader v. Brewer*, 531 F.3d 1028, 1036 (9th Cir. 2008); *Lerman*, 232 F.3d at 146-47; *Krislov v. Rednour*, 226 F.3d 851, 866 (7th Cir. 2000).  The Seventh Circuit has explained how a registration requirement severely burdens a candidate's First Amendment rights when he faces a minimum-signature requirement:

> Although the [statute] does not go so far as to specifically prohibit candidates from associating with individuals who are not residents of Illinois or who are not registered to vote, it still substantially burdens this right of association by preventing the candidates from using signatures gathered by these circulators in an attempt to gain a place on the ballot.  By doing so, the law inhibits the expressive utility of associating with these individuals because these potential circulators cannot invite voters to sign the candidates' petitions in an effort to gain ballot access.  This, in turn, prevents these individuals from being used as conduits for disseminating the candidates' brand of political speech.

25

*Krislov*, 226 F.3d at 860-61; *see also Lerner*, 232 F.3d at 147 (same).   This rationale simply does not apply where a candidate can easily secure a spot on the ballot without gathering signatures – by, for instance, paying a small fee.   Under these circumstances, a candidate's "expressive utility" of associating with non-registered persons is *not* diminished because the only thing non-registered persons cannot do – gather valid signatures – is wholly inconsequential.   Since the expressive utility of associating with non-registered persons is not lessened where a candidate has an easy, non-signature-based route to the ballot, there is every reason to believe that such a candidate *will* engage non-registered persons to spread his message and, thus, that the total number of voices speaking on behalf of the candidate will *not* decrease.   Simply put, when a registration requirement for petition circulators is paired with a simple and low-cost non-signature based route to the ballot, the registration requirement does not burden free speech and associational rights in the ways that have led courts to strike these requirements down.

Notably, Davis has been unable to cite a single case in which any court has found a regulation of petition circulation to be severely burdensome where, as in this case, a candidate or initiative sponsor had the ability to avoid a minimum petition-signature requirement altogether by paying a modest fee.   And that should come as no surprise.   Regulations of petition circulation do not, by their very

nature and under all circumstances, impose serious burdens on a candidate's First Amendment rights. *See, e.g., Deters*, 518 F.3d at 380 (court must weigh the burden imposed by a state's election law against the state's interest in enforcing the statute). On the contrary, petition regulations severely burden a candidate's First Amendment rights when they interfere in some meaningful way with his ability to get on the ballot; to spread his message and reach his desired audience; or to participate fully in the electoral process. None of these circumstances is present where, as here, Davis may secure a place on the ballot by paying a small fee and where he can use non-qualifed petition circulators to spread his message and communicate with voters.

In an effort to show that he cannot avoid being burdended by the Registration Statute, Davis argues that he *must* use the petition option to qualify for the ballot. He says he has a pressing need to "gauge" his "support" among the electorate, and he claims that he can only do that through a petition drive that tells him how many voters are willing to sign on the "dotted line." (TR at 47, 57.) But Davis' counsel has conceded that neither the Registration Statute nor the Ballot Access Statute prevent Davis from "gauging" support in "exactly" the way he wishes to do, regardless of how he seeks to qualify for the ballot. (*Id.* at 65.) Specifically, counsel admitted that notwithstanding the statutes, Davis could use non-registered persons to ask voters to sign his petitions (which would not be

turned in to election officials) and he could thereby determine if a sufficient number of voters supported his candidacy.[10] (*Id.*) Alternatively, as Davis admitted, the non-registered persons whom he desires to circulate his petitions could accompany an eligible petition circulator (who could obtain signatures that could be submitted to Clerk Green) and, collectively, they could guage support for Davis. Moreover, there are still other ways of "gauging" support among the electorate that do not involve petition circulation, and Davis has not tried any of them. Simply put, Davis could *both* secure access to the ballot by paying the filing fee *and* gauge the support of the electorate – without running afoul of the Registration Statute. Thus, the statute does not severely burden him as he claims.

In the end, Davis' severe burden claim boils down to this untenable proposition: if the State had provided that the *only* way for him to get on the ballot was to pay the filing fee, the State would *not* have impermissibly burdened his First Amendment rights, but by offering him the filing fee option *plus* the *additional option* of securing ballot access by having registered Michigan voters gather petition signatures, the State has severely burdened his First Amendment rights. It simply does not make sense to argue, as Davis does, that by offering the

---

[10]   Counsel suggested that if Davis were to collect signatures but not turn them in to election officials, his political opponents would use that against Davis. But that is mere speculation and does not change the fact that the Registration Statute does not prevent Davis from "gauging" his "support" by gathering signatures.

additional *option*, the State somehow transformed a non-burdensome ballot access regime into a severely burdensome one.  Because the Ballot Access Statute and the Registration Statute – when read together, as they must be, *see Lerman, supra* – impose only a *de minimis* burden on Mr. Davis's First Amendment rights, Davis' challenge to the statutes likely does not require the application of strict scrutiny.

> **2.    The Ballot Access Statute and the Registration Statute Likely Survive Under the Applicable Less Exacting Scrutiny**

Under the applicable less exacting level of scrutiny, the Ballot Access Statute and Registration Statute are likely constitutional because they are reasonable, non-discriminatory, and serve important regulatory interests. *Timmons*, 520 U.S. at 358-59.   The state interest served by the Registration Statute is preventing election fraud.  As Secretary Johnson explains:

> [T]he burden is justified by the State's compelling interest in preventing fraud…. Under [the Registration Statute], the circulator of a nominating petition must personally witness each voter affix his or her signature to the petition, question each signer regarding their qualification … to sign the petition, and sign and date the certificate of circulator attesting to these matters.  Requiring the circulator of a nominating petition to be registered to vote in Michigan enables the filing official to readily locate the circulator if questions arise regarding the validity or genuineness of signatures.  A person who makes a false statement in the certificate of circulator may be referred for criminal prosecution.  M.C.L. 168.544c(12).

(ECF #22 at 23.)

Detecting and preventing election fraud "is certainly a compelling state interest," *Deters*, 518 F.3d at 387, and the registration requirement is a reasonable – although not necessarily the least restrictive – means of protecting this interest.[11] *Cf. Initiative & Referendum Inst. v. Jaeger*, 241 F.3d 614, 616-17 (8th Cir. 2001) (allowing only North Dakota residents to circulate petitions is a reasonable means of preventing election fraud because it allows the state to locate and subpoena circulators). Moreover, the registration requirement does not discriminate among political candidates – all who choose to circulate petitions as their path to the ballot must use registered Michigan voters as circulators. And, again, candidates who object to the registration requirement are free to pay the modest filing fee pursuant to the Ballot Access Statute. For all of these reasons, the Registration Statute and the Ballot Access Statute are reasonable means of achieving important state

---

[11] If strict scrutiny applied in this case, the Court's focus would, of course, be different. The Court would have to ask whether the statutes are narrowly tailored to serve the compelling interest of preventing fraud. *See Timmons, supra*. Indeed, that is precisely what this Court did in a companion case, *Moore*, *supra*, (Dkt. #35), when it found that the Registration Statute was likely not narrowly tailored as applied to a candidate for the United States House of Representatives. Critically, however, the Court applied strict scrutiny in *Moore* because the Ballot Access Statute does not apply to congressional elections, and thus the candidate in *Moore* did not have the option of securing a spot on the ballot by paying a filing fee. The candidate's only option to qualify for the ballot in *Moore* was by submitting nominating petitions. As *Nader* makes clear, under those circumstances, the Registration Statute imposes a severe burden on a candidate's First Amendment rights, and strict scrutiny applies. Where, as here, the application of the Registration Statute does not impose a severe burden, the statute is subject to a less exacting level of scrutiny, and narrow tailoring is not essential.

interests, and they are thus likely constitutional under the less exacting level of scrutiny applicable here. *Cf. Jaeger*, 241 F.3d at 616-18 (upholding petition circulator residency requirement under less exacting standard of review).

### B. Davis Has Not Shown That He Would Suffer Irreparable Injury Without an Injunction

Davis also has failed to show that he would suffer irreparable harm if the Court declines to grant injunctive relief.  Davis' allegation of irreparable injury relies on the proposition that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  (*See* ECF #5 at ¶5 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).)  But, as discussed above, neither the Ballot Access Statute nor the Registration Statute infringe on Davis' First Amendment freedoms.

Nor has Davis suffered any other irreparable injury.  Despite Davis' claims that he has a pressing need to "gauge support" among the electorate through the use of non-registered persons, his counsel conceded that the Registration Statute does not prevent Davis from doing exactly that.  In lieu of, or in addition to, seeking injunctive relief, Davis could have – but thus far has not – taken any number of alternative steps to qualify for the ballot and gauge his support among

31

the electorate.[12]  Davis has not sought to conduct a petition drive using any of the Michigan registered voters with whom he would be "comfortable" circulating his petitions.  He has not asked any eligigble petition circulators to accompany the four non-registered persons whom he wants to deliver his message to the electorate.  He has not attempted to gauge the electorate's support by going door-to-door in his district, running phone banks, or conducting a public opinion poll.  And he has not paid the filing fee to ensure his spot on the ballot.  In light of the alternative methods that Davis has to qualify for the ballot and gauge support for his candidacy, this is decidedly *not* a case in which the circumstances "clearly demand" the "extraordinary remedy" of injunctive relief.  *See Leary*, 228 F.3d at 739.

### C. Balancing of the Harms Does Not Favor Injunctive Relief

In order to obtain injunctive relief, Davis "must establish that … the balance of equities tips in his favor…."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  In this case, the balance of interests does not favor injunctive relief because Davis has not demonstrated that enforcement of the Ballot Access and Registration Statutes would violate his First Amendment rights.  In contrast, Clerk Green has a valid interest in enforcing the Registration Statute as a means of

---

[12]  The Court notes that because Davis' federal criminal trial has been adjourned until September, his claimed need to resolve his ballot qualification well in advance of the July 22nd filing deadline has been alleviated.

preventing fraud in connection with any petitions submitted by a candidate using the signature option for securing ballot access. Davis' inability to demonstrate that he would be harmed by the denial of injunctive relief precludes a finding that the balance of equities tips in his favor.

### D. Issuance of an Injunction Would be Contrary to the Public Interest

Finally, the public interest weighs in favor of denying Davis' request for injunctive relief.  In First Amendment cases, "the determination of where public interest lies … is dependent on a determination of the likelihood of success on the merits of the First Amendment challenge, because if the regulation in question is likely to be deemed constitutional, then public interest will not be harmed by its enforcement."  *Jones v. Caruso*, 569 F.3d 258, 278 (6th Cir. 2009) (citing *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998)) (internal quotation marks omitted). As discussed above, the public has a legitimate interest in the enforcement of the Ballot Access and Registration Statutes – namely, the prevention of election fraud – and the statutes are likely constitutional as applied here.  Because Davis' First Amendment claim is not likely to succeed on the merits, injunctive relief would not be in the public interest.

## CONCLUSION

For all of the reasons explained above, the Court concludes that Davis is not entitled to injunctive relief, and, accordingly, the Court **DENIES** his motion for temporary restraining order (ECF #5).

**IT IS SO ORDERED.**

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated: June 17, 2014


I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on June 17, 2014, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(313) 234-5113